FILED
2010 Mar-24  PM 01:26
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **SARAH BEAM, personal** | ) | |
| **representative of the Estate of** | ) | |
| **JAMES ANTHONY LARD,** | ) | |
| **deceased,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-08-S-0933-NW** |
| | ) | |
| **MCNEILUS TRUCK AND** | ) | |
| **MANUFACTURING, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

This action is before the court on the motion for summary judgment and two

motions to exclude filed by defendant, McNeilus Truck and Manufacturing, Inc.[1]  The

suit arises out of an incident that occurred on December 11, 2007, when plaintiff's

decedent, James Anthony Lard, fell from the riding platform on a garbage truck

manufactured by defendant,[2] and died from the resulting injuries.  Sarah Beam, as

personal representative of the Estate of James Anthony Lard, asserted claims against

defendant based on the so-called "Alabama Extended Manufacturer's Liability

---

[1] *See* doc. nos. 31, 34, and 40.

[2] It is unclear whether Mr. Lard dismounted intentionally (by stepping or jumping off) or
unintentionally (by falling).  Even so, for the sake of simplicity, the court will refer to the dismount
as a "fall."

Doctrine" ("AEMLD"), an implied warranty of merchantability, and an implied warranty of fitness for a particular purpose.[3]  Defendant seeks the dismissal of all claims, as well as the exclusion of evidence tendered by plaintiff's expert, L.D. Ryan.

In support of its motion for summary judgment, defendant argues that plaintiff's AEMLD claim must fail because plaintiff failed to offer substantial, *admissible* evidence to support the elements of such a claim, and also because safety warnings conspicuously mounted on the vehicle occupied by plaintiff's decedent were ignored.[4]  Finally, defendant argues that plaintiff's warranty claims are not permissible in a suit of this nature, but that, even if such claims were cognizable, plaintiff failed to offer substantial, *admissible* evidence to support them.[5]

Defendant's first motion to exclude seeks to exclude the testimony of plaintiff's specially-retained expert witness, Dr. L.D. Ryan, arguing that he is not qualified to testify in this case, and that his opinions are not reliable.[6]  *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Defendant's second motion seeks the exclusion of supplemental materials created by plaintiff's

---

[3] *See* doc. no. 6 (amended complaint).  *See also* Ala. Code. § 7-2-314 (merchantability) and § 7-2-315 (fitness for a particular purpose).  *See generally* Jenelle Mims Marsh & Charles W. Gramble, *Alabama Law of Damages* §§ 32:9 and 32:11 (5th ed. 2004).

[4] *See* doc. no. 32 (brief in support of motion for summary judgment filed by defendant), at 11-20.

[5] *See id.* at 20-23.

[6] *See* doc. no. 34 (first motion to exclude filed by defendant).

expert, based upon the fact that the opinions contained in the supplemental submission were not disclosed prior to the deadline specified in this court's scheduling order.[7]

Upon consideration, and for the reasons discussed below, defendant's motions to exclude the testimony and opinions of plaintiff's expert will be granted.  As a consequence, and in the absence of admissible evidence to support plaintiff's claims, defendant's motion for summary judgment also will be granted.

## I.  STANDARDS OF REVIEW

### A.    Motion to Exclude or Strike Expert Testimony

The starting point for any discussion of the admissibility of opinion testimony offered by so-called "expert witnesses" is Federal Rule of Evidence 702.  As amended in 2000, in response to the Supreme Court's seminal decisions in the so-called "*Daubert* Trilogy" — *i.e.*, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993),[8] *General Electric Co. v. Joiner*, 522 U.S. 136 (1997),[9] and *Kumho Tire*

---

[7] *See* doc. no. 40 (second motion to exclude filed by defendant).

[8] The *Daubert* Court made it clear that the requirement of reliability found in Rule 702 was the centerpiece of any determination of the admissibility of opinion testimony, 509 U.S. at 589, and the Court identified four factors to be used when determining the reliability of scientific evidence: (1) whether the theory can and has been tested; (2) whether it has been subjected to peer review; (3) the known or expected rate of error; and (4) whether the theory or methodology employed is generally accepted in the relevant scientific community.  *Id*. at 593-94.

[9] In *Joiner*, the Court established the standard for reviewing trial court rulings of admissibility, and held that such rulings would be made under an abuse of discretion standard.  522 U.S. at 141.  The *Joiner* Court also established the important test of analytical "fit" between the

*Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)[10] — Rule 702 now provides that:

> If scientific, technical, or other specialized knowledge will *assist the trier of fact* to understand the evidence or to determine a fact in issue, a witness *qualified as an expert* by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon *sufficient facts or data*, (2) the testimony is the product of *reliable principles and methods*, and (3) the witness has *applied* the principles and methods *reliably to the facts* of the case.

Fed. R. Evid. 702 (emphasis supplied).  As the emphasized text of the foregoing quotation serves to indicate, the requirements of this rule can be grouped under three broad headings: *qualifications*, *reliability*, and *helpfulness*.  *See*, *e.g.*, *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (concluding that, "under Rule 702, we engage in a rigorous three-part inquiry"); *Quiet Technology DC-8*, *Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340 (11th Cir. 2003) (discussing the "three part inquiry [used] to determine the admissibility of expert testimony under Fed. R. Evid. 702").

Even though a "trial court has wide discretion in determining whether to

---

methodology employed by an expert witness and the conclusions drawn.  *Id*. at 146.  The Court reasoned that just because a methodology is acceptable for some purposes, it may not be acceptable for others, and a court may not admit evidence when there is "simply too great an analytical gap between the data and the opinion proffered."  *Id*.

[10] In *Kumho Tire*, the Court made it clear that testimony based solely on the experience of an expert would not be admissible.  526 U.S. at 157.  The expert's conclusions must be based on sound scientific principles, and the discipline itself must be a reliable one.  *Id*. at 156.  The key consideration is whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Id*.  The Court emphasized that judges have considerable leeway in determining both how to test the reliability of evidence, and in deciding whether such evidence is reliable.  *Id*. at 151-53.

4

exclude expert testimony," *Montgomery v. Noga*, 168 F.3d 1282, 1303 (11th Cir. 1999) (quoting *United States v. Cross*, 928 F.2d 1030, 1049 (11th Cir. 1991)), fidelity to the "gatekeeping role" imposed upon the trial court by the *Daubert* decision[11] requires district court judges to

> engage in a rigorous inquiry to determine whether: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusion is sufficiently reliable as determined by the sort of inquiry mandated by *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

*Rink v. Cheminova, Inc.,* 400 F.3d 1286, 1291-92 (11th Cir. 2005) (quoting *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (footnote omitted)).  *See also Frazier*, 387 F.3d at 1260 ("While there is inevitably some

---

[11] The *Daubert* decision held that the "general acceptance" test framed in *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (D.C. Cir. 1923), "should not be applied in federal trials" because it had been superseded by the Federal Rules of Evidence enacted by Congress in 1975. *Daubert*, 509 U.S. at 588-89 & n.6.  *See also General Electric Co. v. Joiner*, 522 U.S. 136, 142 (1997) (observing that *Daubert* held "that the 'austere' *Frye* standard of 'general acceptance' had not been carried over into the Federal Rules of Evidence").

In place of the general acceptance standard, *Daubert* substituted *the trial court judge*, acting in the role of "gatekeeper" to the jury box, *see* 509 U.S. at 589 n.7, 597, and charged the judge with the "obligation" to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id*. at 589.  *See also id*. at 594 (observing that Rule 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand"), and 597 (same).

In procedural terms, this means that the trial judge is required to conduct "a preliminary assessment" pursuant to Federal Rule of Evidence 104(a) as to "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id*. at 593-94.

overlap among the basic requirements . . . they remain distinct concepts and the courts must take care not to conflate them.").[12]

Furthermore, opinion testimony proffered by an expert witness must be excluded unless the *party proffering the witness* proves, by a *preponderance* of the evidence, that the witness is qualified, and that his testimony is both reliable and helpful. *See*, *e.g.*, *Rink*, 400 F.3d at 1292 ("The party offering the expert has the burden of satisfying these three elements by a preponderance of the evidence.") (citing *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999)); *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) (same); *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (same).

### B.    Motion for Summary Judgment

Federal Rule of Civil Procedure 56 provides that summary judgment "should

---

[12] It is important to understand that this categorization really is nothing more than a rearrangement and consolidation of the explicit requirements of Rule 702. The first and third prongs of the Eleventh Circuit's test (qualification and helpfulness, respectively) are taken from Rule 702's preamble. *See* Fed. R. Evid. 702 ("If scientific, technical, or other specialized knowledge *will assist the trier of fact* to understand the evidence or to determine a fact in issue, a witness *qualified as an expert* by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise . . . .") (emphasis supplied). The major change accomplished by the Eleventh Circuit's restatement is truncation of Rule 702's three-part litmus test for methodological reliability. *See* Fed. R. Evid. 702(1)-(3). Clearly, that does not mean that district courts are to *ignore* the explicit language of Rule 702; on the contrary, the Eleventh Circuit's formula simply recognizes that the three numbered prerequisites (and the additional thoughts imparted by the Supreme Court in *Daubert*) all relate to the same general concern: the reliability of the methodology utilized by the expert. Procedurally, then, the district court should consider satisfaction of those requirements separate and apart from qualification and helpfulness.

be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[13]  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the

---

[13] Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*."  Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied).  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

> outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied).

*See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II.  SUMMARY OF FACTS

**A.    The Accident**

As previously noted, this action arises out of an accident that occurred on December 11, 2007.  Plaintiff's decedent, James Anthony Lard, then was employed by Lauderdale County, Alabama as a refuse collector and, on the morning in question, was performing his duties along Lauderdale County Road 134.[14]  Lard was riding on an exterior step mounted on the driver's side of a garbage truck manufactured by defendant,[15] but owned and operated by the County's Solid Waste Department, when he fell or stepped off the moving truck and was killed.[16]

---

[14] *See* doc. no. 33, Ex. B (Depo. of Barry Trousdale) (hereafter, "Trousdale Depo."), at 48 and 117-20.

[15] *See* doc. no. 33, Ex. C (Depo. of Scott Hamner) (hereafter, "Hamner Depo."), at 20-22 and 89-90.

[16] *See* doc. nos. 26 (amended joint stipulation) and Trousdale Depo., at 120-23.

Immediately prior to the accident, Lard had collected the refuse from a residence located on the north side of the road.  He then climbed onto the riding step located on the driver's side of the vehicle.[17]  Barry Trousdale, the driver of the truck, visually confirmed that Lard was aboard the riding step with "four points of contact" — a phrase indicating that Lard was grasping the handholds on the side of the truck with both hands, and, was standing with both feet on the riding step — before Trousdale began driving away from the residence.[18]

Approximately fifteen seconds later, Trousdale glanced in his rearview mirror and saw Lard rolling in the road.[19]  Neither Trousdale nor anyone else saw Lard fall from the truck.[20]  No one knows whether Lard dismounted intentionally or unintentionally — *i.e.*, whether he stepped off the riding step or fell off.[21]  Trousdale testified that there were no bumps or curves in the road, but estimated that he was traveling approximately twenty miles per hour at the time.[22]

## B.    The Garbage Truck and Riding Step

The garbage truck ridden by plaintiff's decedent was a 2004 McNeilus "rear

---

[17] *See id.* at 117-20.

[18] *Id.* at 12-13, 37-38, 58-60, and 120.

[19] *See id.* at 120-22.

[20] *See id.* at 120-24.

[21] *See, e.g.*, Trousdale Depo. at 120-24; doc. no. 33, Ex. D (Depo. of Robert Bevis) (hereafter, "Bevis Depo."), at 58-60; Hamner Depo. at 71-72.

[22] *See* Trousdale Depo. at 123-126.

loader,"[23] a truck that requires collectors to physically roll garbage containers to the rear of the vehicle. Such trucks are frequently selected by waste-handling companies for their versatility.[24] Other types of garbage trucks include "side loaders," with automated arms that load the garbage, which are typically used in residential areas,[25] and "front loaders" designed for loading large dumpsters.[26] Lauderdale County's refuse-collection route supervisor, Scott Hamner, explained the County's choice of "rear loaders" as being the result of the County's rural routes, which made it difficult to collect trash with the automated loaders used in urban, residential subdivisions:

> Q. Why does Lauderdale County use rear loaders as opposed to loaders with automated arms or side loaders or front loaders?
>
> A. The way the county is, tougher for the fully automated trucks to service some of the customers.
>
> Q. What do you mean by that?
>
> A. Where they place the carts and getting cooperation from customers.
>
> Q. To do a fully automated one, you would have to actually be able to pull right up next to the garbage can?

---

[23] *See* Hamner Depo. at 89-90.

[24] *See* Bevis Depo. at 65-67; doc. no. 33, Ex. E (Depo. of Fred P. Smith) (hereafter, "Smith Depo."), at 136-39.

[25] *See* Hamner Depo. at 18 and 93-94; Bevis Depo. at 65-66.

[26] *See* Bevis Depo. at 65-66.

A.    Yes, sir.[27]

Hamner further testified that the riding step feature was an important factor in

the County's decision to purchase defendant's truck:

Q.    Do you think the riding steps are an important part of these rear
      loaders that you guys use?

A.    Yes, sir.

Q.    Why?

A.    Well, if the gentleman is constantly coming from the cab to the
      rear, it's going to be the same as having an automated truck, in
      my opinion.

Q.    So it's mainly efficiency purposes?

A.    Yes, sir.

Q.    It would take you forever to do these —

A.    That's correct.

Q.    — routes without riding steps?

A.    That's correct.

            . . .

Q.    In many areas it wouldn't be practical to ask the collector to walk
      alongside the truck as opposed to —

A.    No, sir.

_____

[27] Hamner Depo. at 93.

Q.      — to climbing in the cab either, would it?

A.      No, sir.

Q.      It's not practical to tell them to get in the truck every single time?

A.      That's correct.[28]

In fact, Lauderdale County would not have purchased the McNeilus truck if it was not equipped with riding steps.[29]  In conjunction with the riding step, the garbage truck was equipped with hand holds for each of the rider's hands[30] and a warning label explaining when to *avoid* using the step.[31]  The label warned that the riding step should not be used "when speeds are expected to exceed 10 mph or when distance traveled is in an excess of two-tenths of one mile."[32]  When the McNeilus truck was purchased, defendant dispatched an employee to Lauderdale County who pointed out the warning decals, including the warning against using the riding step when speeds exceed ten miles per hour or distances exceed two-tenths of a mile.[33]

The distance between the stop at which plaintiff's decedent mounted the riding step and the next planned stop was over six-tenths of a mile,[34] but the truck had

---

[28] Hamner Depo. at 96-97.

[29] *See* Bevis Depo. at 67-72.

[30] *See* Trousdale Depo. at 37-38, 57-58, and Ex. 12 (hand holds visible in photographs).

[31] *See id.* at 145-46 and 166-70.

[32] *Id.* at 145-46 and 166-70.

[33] *See* Bevis Depo. at 76-80 and 89-90.

[34] *See* doc. no. 33, Ex. F (Declaration of Fred P. Smith), ¶ 7.

traveled significantly less than two-tenths of a mile at the time he fell.[35]  Even so, the truck was traveling at approximately twenty miles per hour — twice the speed mentioned in the warning label — when Lard fell.[36]

There is no evidence, however, that Lard read the warning decal, understood the warning, expected the speed to exceed ten miles per hour, or recognized that the distance to the next stop was over two-tenths of a mile.  On the other hand, Barry Trousdale, the driver of the truck, read and understood the warning label and the danger involved.[37]  Yet, he operated by his own personal rules, limiting his speeds to twenty-five (as opposed to ten) miles per hour when a rider was on the exterior of the truck.[38]  Lauderdale County simply instructed the drivers to operate at a "safe speed."[39]  Regarding distance, Lauderdale County instructed its truck drivers to travel no farther than 500 yards (0.28 of a mile) when a garbage handler was occupying the step on the exterior of the truck.[40]

## C.    Relevant Procedural Background

This court entered a scheduling order, incorporating the report of the parties'

---

[35] *See* Trousdale Depo. at 123.

[36] *See id.* at 126.

[37] *See id.* at 145-46 and 239-41.

[38] *See* Trousdale Depo. at 61-63.  *See also* Hamner Depo. at 30-31.

[39] Hamner Depo. at 30-31.  *See also* Trousdale Depo. at 61-63.

[40] *See* Trousdale Depo. at 23-26 and 60-61; Hamner Depo. at 38.

13

planning meeting, on July 8, 2008.  That order required plaintiff to disclose any expert witnesses, together with the reports required by Federal Rule of Civil Procedure 26(a)(2), on or before January 16, 2009.[41]  At the request of the parties, that deadline was later extended to March 15, 2009,[42] and the deadline for the completion of all discovery, originally set for March 2, 2009, was extended to May 30, 2009.[43]

On or before March 15, 2009, plaintiff disclosed an expert report and appendix prepared by L.D. Ryan, Ph.D., and containing ten opinions.[44]  On April 20, 2009, immediately prior to his deposition, Dr. Ryan presented defendant's counsel with a revised report *dated January 7, 2009*, that contained *thirteen* opinions.[45]  In response to defendant's motion for summary judgment, plaintiff submitted yet another report authored by Dr. Ryan, labeled "Rebuttal Report, Parts I and II," containing a third set of opinions, and an affidavit executed by Dr. Ryan containing yet more opinions.[46]

---

[41] *See* doc. nos. 11 (report of planning meeting) and 13 (scheduling order).

[42] *See* doc. nos. 19 (joint motion requesting extension) and 20 (margin order extending deadlines).

[43] *See* doc. nos. 13 (original scheduling order) and 24 (joint motion requesting extension); *see also* order dated April 30, 2009, extending the discovery deadline.

[44] *See* doc. no. 33, Ex. A (Depo. of L.D. Ryan) (hereafter, "Ryan Depo."), at Ex. 3 (report entitled "Opinions").

[45] *See* Ryan Depo. at Ex. 17.

[46] *See* doc. no. 36 (plaintiff's response), at Exs. A, C, and D.

## III.  DISCUSSION

### A.    Defendant's Motion to Exclude the Opinion Testimony of Plaintiff's Expert

Defendant argues that plaintiff's expert, Dr. L.D. Ryan, is not qualified to testify in this case, and that his opinions are speculative, subjective, and unreliable.[47] In response, plaintiff relies on Dr. Ryan's training as a mechanical engineer — he has earned bachelor's and master's degrees in mechanical engineering and a Ph.D. in agricultural engineering — and his experience in designing equipment, teaching and publishing, and familiarity with the techniques for "guarding" and "warning" against the hazards of dangerous equipment.[48]   The court finds that, even though Dr. Ryan has prior experience as a mechanical engineer and a long history as an expert witness, he has no experience with refuse collection or garbage-truck design, and he is not qualified to give expert opinion testimony in this case.

Plaintiff proffers Dr. Ryan's opinion testimony for the purpose of proving two elements of her claim under Alabama's Extended Manufacturer's Liability Doctrine ("AEMLD"):  *i.e.*, that defendant's garbage truck was defectively designed, and the defect caused the injuries and death of plaintiff's decedent.

---

[47] *See* doc. no. 34 (defendant's first motion to exclude), at 2.

[48] *See* doc. no. 37 (plaintiff's response to defendant's first motion to exclude), at 5-6; *see also* Ryan Depo. at Ex. 1 (Curriculum Vitae) (containing an extensive list of Dr. Ryan's accomplishments).

In order to prove that a product is defective for purposes of the AEMLD, a plaintiff must prove that

> a safer, practical, alternative design was available to the manufacturer at the time it manufactured the [product]. The existence of a safer, practical, alternative design must be proved by showing that:
>
>> (a) The plaintiff's injuries would have been eliminated or in some way reduced by use of the alternative design; and that
>>
>> (b) taking into consideration such factors as the intended use of the [product], its styling, cost, and desirability, its safety aspects, the foreseeability of the particular accident, the likelihood of injury, and the probable seriousness of the injury if that accident occurred, the obviousness of the defect, and the manufacturer's ability to eliminate the defect, the utility of the alternative design outweighed the utility of the design actually used.

*General Motors Corp. v. Jernigan*, 883 So. 2d 646, 662 (Ala. 2003) (quoting *Hannah v. Gregg, Bland & Berry, Inc.*, 840 So. 2d 839, 858 (Ala. 2002) (emphasis omitted)) (internal quotation marks omitted).

Thus, to testify that a challenged product is defectively designed, an expert witness must be qualified to testify that "a safer, practical, alternative design was available to the manufacturer." *Id.* This requires, in turn, that the expert be qualified to testify that the utility of the alternative design outweighs the utility of the

16

challenged design, and that use of an alternative design would have eliminated or reduced the injuries suffered.  *See Long v. Raymond Corp*., 245 Fed. Appx. 912, 916 (11th Cir. 2007).  *See also General Motors Corp. v. Jernigan*, 883 So. 2d 646, 662 (Ala. 2003) (explaining that the risk-utility test must be met to succeed on an AEMLD claim based on a design defect).  To be qualified to evaluate the utility of a design, the witness must be proficient at evaluating

> such factors as the intended use of the product, its styling, cost, and desirability, its safety aspects, the foreseeability of the particular accident, the likelihood of injury, and the probable seriousness of the injury if that accident occurred, the obviousness of the defect, and the manufacturer's ability to eliminate the defect . . . .

*Jernigan*, 883 So. 2d at 662 (internal quotation marks and brackets omitted). Essentially, the witness must be able to perform a meaningful cost-benefit analysis of the relative merits of both the original and alternative designs.  *See Tokio Marine & Fire Ins. Co., Ltd. v. Grove Mfg. Co.*, 958 F.2d 1169, 1174 (1st Cir. 1992) (discussing defects in terms of cost versus benefit in crane case).

Turning to a discussion of garbage trucks specifically, a witness cannot adequately perform a cost-benefit analysis on original and alternative designs without knowledge of the refuse-collection industry and garbage-truck design.  *See id.*  ("[A] meaningful cost benefit analysis . . . required, in turn, considerable familiarity with the device itself; with how hydraulic cranes work and are operated; with crane design,

manufacture and marketing; with applicable industry standards; and so on.").

Because garbage trucks operate on the road, knowledge of garbage-truck design

would necessarily include knowledge of road-vehicle design and the specialized

requirements road vehicles must meet, as well.

Plaintiff's expert, however, has little or no experience in the world of refuse

collection, road-vehicle design generally, or garbage-truck design specifically.  He

has never written a book or article on garbage trucks.[49]  He has never designed a

garbage truck.[50]  He has not taught a course dealing specifically with garbage trucks.[51]

He holds no patents on garbage truck devices or components.[52]  Although Dr. Ryan

has testified in hundreds of cases, he has never before testified in one involving a

garbage truck.[53]  He has never written a book or article on any type of motor vehicle

designed for road use.[54]  He has never been a consultant to any company in the refuse

industry.[55]  He has no experience in the solid-waste/garbage-hauling industry.[56]  He

had not examined a rear-loading garbage truck prior to this case.[57]  He "thinks" he

---

[49] *See* Ryan Depo. at 6 and 9.

[50] *See id.* at 8.

[51] *See id.* at 9.

[52] *See id.* at 9.

[53] *See id.* at 9-10.

[54] *See id.* at 10-11.

[55] *See* Ryan Depo. at 20.

[56] *See id.* at 28.

[57] *See id.* at 52-53.

knows how to operate a rear loader, but he has not taken the "one second" he claims it would require to learn for sure how to operate such a vehicle.[58]   Other than watching three hours of videos on "YouTube," he has no training or experience in designing waste-hauling routes.[59]   He is not knowledgeable about the history or evolution of rear-loading garbage-truck designs.[60]   Moreover, the mere fact that Dr. Ryan

> is a licensed engineer is, in and of itself, insufficient to qualify him as an expert in this case. *See United States v. Brown*, 415 F.3d 1257 (11th Cir. 2005) (upholding district court's refusal to qualify expert with a Ph.D. in plant pathology who had only worked with the chemical substance at issue in the case on "isolated projects"); *Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co.*, 958 F.2d 1169, 1174 (1st Cir. 1992) (finding engineer unqualified to provide expert testimony on a purported design defect in a crane, where the engineer had no experience designing, maintaining, or operating cranes); and *Diviero v. Uniroyal Goodrich Tire Co.*, 919 F. Supp. 1353, (D. Ariz. 1996) (concluding that engineer did not have the expertise to testify about a purported defect in steel belted radial tires).

*Wright v. Case Corp.*, No. 06-Civ.A.1:03CV1618-JEC, 2006 WL 278384, at *3 (N.D. Ga. Feb. 01, 2006).

---

[58] *See id.* at 11-12.

[59] *See id.* at 114.

[60] *See id.* at 46-47, 49, and 56.  Dr. Ryan's inexperience in the subject matter of this case is further illustrated by the safety cage he constructed as an alternative design.  In his deposition, he was forced to admit that the alternative design was probably illegal. *See* Ryan Depo. at 35. Dr. Ryan failed to incorporate into his design the rules governing motor vehicles operating on the road.  One who was an expert in the proper design and construction of road vehicles generally or garbage trucks specifically would incorporate such rules into their design beforehand.  Dr. Ryan's "probably illegal" design highlights his lack of familiarity with the design of motor vehicles for use on the road.

Likewise, Dr. Ryan's experience with guarding devices and warning labels is not, alone, sufficient to qualify him to offer opinion testimony in this case because his prior experience did not involve garbage trucks or similar motor vehicles designed for road use. *Id.*

Finally, the fact that Dr. Ryan has testified or consulted as an expert in hundreds of cases involving a variety of products does not qualify him to testify in this case.[61] *See Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 800 (4th Cir.1989) ("[I]t would be absurd to conclude that one can become an expert simply by accumulating experience in testifying."); *Tokio Marine & Fire Ins. Co., Ltd. v. Grove Mfg. Co.*, 762 F. Supp. 1016, 1018 (D.P.R. 1992) ("The fact that a person spends substantially all of her time consulting with attorneys and testifying in trials is not a disqualification, but it is not an automatic qualification guaranteeing admission of expert testimony.").

For all of the foregoing reasons, plaintiff failed to carry her burden of

---

[61] Dr. Ryan has been involved in hundreds of cases involving a variety of products, and his testimony has been at issue in a number of those cases. *See, e.g., James v. Cincinnati, Inc.*, 243 Fed. Appx. 25 (5th Cir. 2007); *Christ v. Sears, Roebuck and Co.*, 149 F.3d 1182, 1998 WL 344049 (6th Cir. May 27, 1998) (unpublished, but referenced in a table of decisions without reported decisions); *Martinez v. Triad Controls, Inc.*, 593 F. Supp. 741 (E.D. Pa. 2009); *Menz v. New Holland North America, Inc.*, 460 F. Supp. 2d 1058 (E.D. Mo. 2006); *Johnson v. Davidson Ladders, Inc.,* 403 F. Supp. 2d 544 (N.D. Miss. 2005); *Richter v. Home Depot U.S.A., Inc.*, No. 8:05-CV-2153-T-17MAP, 2009 WL 2912781 (M.D. Fla. Feb. 20, 2009); *Hannah v. Gregg, Bland & Berry, Inc.*, 840 So. 2d 839 (Ala. 2002); *Kirby v. Langston's Furniture & Appliance,Inc.*, 631 So. 2d 1301, 1305 (La. Ct. App. 1994).

establishing that Dr. Ryan is qualified to offer opinion testimony that defendant's garbage-truck was defectively designed.  Accordingly, his testimony is due to be excluded under Rule 702.  Because plaintiff has no other admissible evidence of a design defect, Dr. Ryan's testimony that a defect caused the decedent's injuries is also excluded.

Plaintiff also relies on Dr. Ryan's testimony to support the implied warranty claims added in her amended complaint.[62]  Specifically, she seeks to utilize Dr. Ryan's testimony to prove that the garbage truck was unreasonably dangerous, *i.e.*, defective, and that it did not meet the expectations of its purchaser.  As discussed in the context of the AEMLD, Dr. Ryan is not qualified to testify regarding the defectiveness of the garbage truck.  Likewise, plaintiff failed to establish Dr. Ryan's qualification to testify as to the performance of the garbage truck relative to Lauderdale County's expectations.  Because Dr. Ryan is not qualified to testify that the product is defective, and did not meet the expectations of the purchaser, his testimony on these points is also due to be excluded under Rule 702.

In light of the foregoing, a discussion of the reliability and helpfulness of Dr. Ryan's testimony need not be reached.

---

[62] *See* doc. no. 36 (plaintiff's response to defendant's motion for summary judgment), at 21-22.

**B.      Defendant's Motion to Exclude the Supplemental Ryan Materials Filed by Plaintiff**

Subsequent to filing its original motion to exclude *all* of the testimony of Dr. L.D. Ryan, defendant also moved the court to exclude certain supplemental materials tendered by Dr. Ryan because the opinions contained therein were not disclosed in a timely fashion.[63]  The supplemental materials at issue in this motion are a subset of the materials that the court determined are due to be excluded under defendant's original motion to exclude, discussed *supra*. Because the supplemental materials are already due to be excluded, the court need not reach defendant's timeliness argument. In light of the foregoing, the second motion to exclude is due to be granted also, regardless of timing issues.

**C.      Defendant's Motion for Summary Judgment**

Because plaintiff has presented no admissible evidence demonstrating a design defect or causation, plaintiff has not established a *prima facie* case under the AEMLD.   Moreover, because plaintiff has presented no admissible evidence to support *any* element of her warranty claims, plaintiff has not established a *prima facie* claim for breach of the implied warranty of merchantability or the implied warranty

---

[63] *See* doc. no. 40.

of fitness for a particular purpose.[64]  Accordingly, defendant's motion for summary

judgment is due to be granted, and the remaining arguments raised by defendant need

not be addressed.

## IV.  CONCLUSION AND ORDER

In accordance with the foregoing, defendant's motion for summary judgment

and both motions to exclude the testimony of Dr. L.D. Ryan are GRANTED.  All of

plaintiff's claims are dismissed with prejudice.  Costs are taxed to plaintiff.  The

Clerk is directed to close this file.

DONE this 24th day of March, 2010.

_____

United States District Judge

---

[64] Even assuming, for the sake of argument, that the court permitted Dr. Ryan to testify as to the elements of plaintiff's warranty claims, plaintiff provides no facts to support her claims.  Instead, plaintiff's arguments only make general references to Ryan's testimony, without citation to the record.  (*See* doc. no. 36, at 21-22).  The analysis of such general references to the evidence requires the court and opposing counsel to go to great lengths in an attempt "to distill every potential argument that could be made based upon" such materials.  *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).  As the Eleventh Circuit observed in the *Resolution Trust* opinion, however, no such duty is imposed upon district courts.  *Id.*  Consequently, this court will not consider arguments that are not fully developed or bolstered with legal authority.  *See United States Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (refusing to address a party's "perfunctory and underdeveloped argument") (citing *Flanigan's Enterprises, Inc. v. Fulton County*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that "fail[ure] to elaborate or provide any citation of authority in support [of an argument]" results in waiver)).  *See also Lyes v. City of Riviera Beach*, 126 F.3d 1380, 1388 (11th Cir. 1997) (observing that "the onus is upon the parties to formulate arguments").